UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - -

Brian Lieske,

Plaintiff

v. File No. C0-2658 JMR/FLN

Morrie's Brooklyn Park Daewoo, d/b/a Morrie's Brooklyn Park Used Car & Truck Center, and Todd Perry, individually,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

COPY

DEPOSITION OF

BRIAN LIESKE

MAY 23, 2001

9:30 A.M.

EXHIBIT A

CHEREE MURPHY-CARLSON
KINSELLA, HARTIGAN & KELZER
632 Norwest Midland Building
Minneapolis, Minnesota 55401
Telephone (612) 339-6132
Facsimile (612) 339-1986

SCANNED
JUN 01 2004
U.S. DISTRICT COURT ST. PAUL

Q And you don't have any suit pending against them?
A I do not.
Q During those six months when you had the car were you current on your payments?
A Yes I was.
Q And did you stop paying after you junked the car?
A Yes.
Q If you got that car in the fall of '99, did that car die before you moved to the Twin Cities?
A Yes, it did.
Q So you no longer had that when you started work at Advanced Flex in May?
A That's correct.
Q But you did have the Topaz?
A Yes.
Q And the Topaz was drivable?
A Yes, it was.
Q Now you purchased the Taurus from Morrie's in August of 2000?
A That's correct.
Q Why were you getting a second car if you had the Topaz available to you?
A At that time I had a better job and I believed I could handle the payments and I wanted a better car, a more dependable car.

Q You weren't going to trade in the Topaz?
A No, it wasn't tradeable.
Q You didn't have a title anyway?
A Right.
Q So the purpose of getting a car was to get a better car for yourself?
A That's correct.
Q When did you first start looking for another car last year?
A I guess off and on through July and August.
Q So you think July was when you started looking?
A I believe it was.
Q Now you didn't get to Morrie's until August so how many other dealerships did you visit before you got to Morrie's?
A I would visit all kinds of different dealerships but never really talked to anybody. The one thing that held me back of course was my credit. I was pretty much afraid to file anything because I knew I would be denied.
Q Did you ever get the point of talking to anybody at another dealership about a specific car?
A There was one that was in Fridley, but I can't recall the name of the dealership offhand. It was around the same time.

A I had 500 to put down.
Q Your intention then was with the 500 down to finance the purchase of the car?
A That's correct.
Q Did the dealer in Fridley try to arrange financing for you?
A They tried. I don't recall if they actually called any banks or not but they, after looking at my credit report, told me that I needed to clear up some debts first, credit card debts, before I could finance through them.
Q Did you fill out a credit application and give them permission to get the credit report?
A Yes.
Q And they did get the credit report because they discussed it with you?
A That's correct.
Q Were they not able to find any financing for you?
A Like I said, I don't know if they actually even really looked. I just know that I filled out their report and signed papers for them to get my credit report. And they called me the next day and I went down there and talked to them and it was just like I told you, that I had to clear up some debts before they could do anything for me.

Q So do you know if they contacted any particular lenders?
A I do not know.
Q But you do know that they told you that with your credit history there was nothing that they could do for you?
A That's correct.
Q So they never even got to the point of talking about a rate or down payment or anything, they just said with your history there's nothing they could do?
A That's correct, unless I cleared up specific debts.
Q Did he they tell you which debts that you needed to clear up?
A The credit card ones that were in collection.
Q So obviously you didn't buy the Intrepid?
A Right.
Q Did you get that far in discussions with any other dealership prior to Morrie's?
A Not that I recall.
Q So that was the only time you discussed automobile financing with anybody prior to Morrie's?
A Yes.

BY MS. VAN VLIET:
Q You have no recollection of making any other credit applications with any automobile dealerships except for the one?
A That's correct.
Q Do you think it's possible that you could have made others and you just as we sit here today don't recall it?
A It may have been. I can't say for certain.
Q In any case, there's no question that as a result of your experience with the Fridley dealership you were aware of the fact that your credit history was a problem and an obstacle for you in getting automobile credit?
A That's correct.
Q And in fact, before you talked to Morrie's you hadn't found, except for Norvald Motors whom you still owed money to you, except for them you hadn't found any other dealership who was able to extend you credit?
A Correct.
Q Prior to going to Morrie's -- and I'm talking about the year 2000 -- prior to going to Morrie's had you contacted any banks or credit unions directly seeking approval on automobile

Q And did you then sit down and fill out a credit application?
A Yes, I did.
Q And did you give the dealership any money?
A I'm not sure if it was that visit or the next one, but I know that I gave them $500.

( BRIAN LIESKE Deposition Exhibit 2 was marked for identification by the court reporter.)

BY MS. VAN VLIET:
Q Mr. Lieske, you've just been handed deposition Exhibit No. 2, which is entitled at the top of that document receipt.
A Yes.
Q Do you see that?
A Yes, I do.
Q Does that refresh your recollection as to whether or not you gave the dealership any money?
A Yes. I gave them $500 as I stated.
Q And was that on August 23?
A Yes, it was.
Q Did you get a copy of this receipt?
A Yes, I did.
Q At the time that you gave them this $500, you filled out a credit application. Did you fill out any other paperwork or documents on that

occasion?
A I don't recall. I remember Mr. Perry was -- it was late in the day and he was trying to get a hold of the finance company, he was having trouble getting through. I don't recall -- I don't believe I filled out any other paperwork at that time. I don't recall.
Q So on the 23rd when you gave him the $500, you didn't know at that point whether you would actually be able to get financing or not, correct?
A He was very confident that he would be able to arrange the financing and pretty much told me that -- he being Mr. Perry -- I'm sorry -- told me that pretty much went through -- you know he could get this pushed through. So actually, yes, I had the impression that, yes, I had the car at that time.
Q But he didn't tell you specifically that any lender had approved credit at that time?
A No, I don't believe so.
Q And the on 23rd did you take the car home with you?
A Yes, he let us take the car.
( BRIAN LIESKE Deposition Exhibit 3 was

marked for identification by the court reporter.)
BY MS. VAN VLIET:
Q Mr. Lieske, looking at deposition Exhibit No. 3, is that your signature on the lower right hand corner of the document?
A Yes, it is.
Q And this is a rental agreement for the Ford Taurus?
A Yes, it is.
Q And you signed this on the 23rd?
A That's correct.
Q Looking at this document does this refresh your recollection that you signed a rental agreement on that day when you took the car?
A Yes, I did.
Q Now on that day when you met with Mr. Perry, found the Taurus, gave him $500 and executed the rental agreement, did you have discussions with him about the price of the Taurus?
A Yes.
Q And did you come to some agreement on the price of the Taurus?
A Yeah, I believe it was 10,000.
Q $9,995?
A That sounds right.

Q And that's the price that you talked about on that day?
A Yes.
Q And did you have $10,000 in cash?
A I did not.
Q And you told Mr. Perry that you weren't intending to pay cash for the car?
A That's correct.
Q You discussed that the only way you can buy the car would be to get it financed?
A That's correct.
Q And you asked Mr. Perry on behalf of Morrie's to try and arrange the financing so that you could purchase the Taurus?
A That's correct.
Q And they proceeded to do so?
A Yes.
Q Did you tell Mr. Perry that you wanted to seek financing for the Taurus on your own?
A No, I did not.
Q Now on the day that you first gave the $500 it sounds like Mr. Perry told you that he thought he might be able to arrange some financing?
A That's correct.
Q But he didn't discuss with you any specific

lender at that point?
A I believe he did mention Fairlane credit, I believe that that was the bank that he was trying to get a hold of.
Q That's who he was trying to call?
A That's correct.
Q By the time you left on the 23rd he hadn't gotten through to Fairlane credit?
A At I recall, no.
Q So on that particular date Mr. Perry wasn't able to give you exactly the amount financed -- the amount that Fairlane or anybody else would be able to finance for you, correct?
A I don't understand.
Q On that date when you signed the rental agreement and gave him the $500, did you discuss, you know, a percentage rate or an amount financed or the amount of a down payment that would be needed?
A No.
Q Did you discuss with Mr. Perry the amount of the down payment that you wanted to make?
A Yes.
Q And what discussions did you have?
A I told him that we would have a $1,000 to put down. We meaning Courtney and I.

Q Of which you gave him $500?
A Correct.
Q So when you left on the 23rd, you told him you could put a $1000 down?
A That's correct.
Q So when you left on the 23rd, you didn't know for sure whether financing had actually been approved by a lender?
A Not for positive, no.
Q When was the next contact that you had with Morrie's after that day?
A I believe the next conversation was on the phone. I don't recall the date. It was shortly after our first meeting and probably even the next day.
Q And who was the phone conversation with?
A Mr. Perry I believe.
Q Were you at work or at home?
A At home.
Q What do you recall about what was said in that phone conversation?
A I believe it was that he had arranged financing and that I needed to come in and sign papers.
Q Did he tell you who it was arranged through?
A Yes. He said Fairlane credit.

Q Do you remember what he looked like?
A Not offhand.
Q And do you remember the date that you came?
A No, I don't I know that. It wasn't very far after the first meeting on the 23rd but I can't remember the exact date.
Q August 26 sound about right?
A Sounds about right.
Q So when you came in on August 26, did you come alone or did Courtney come with you again?
A Courtney came with.
Q Did anybody else come with you?
A No.
Q On that occasion you met with Alex?
A That's correct.
Q And you did not meet with Todd Perry?
A Correct.
Q And he had told you before that he was going to be out of town?
A That's right.
Q When you came in on the 26th, did you meet with anybody else besides Alex?
A Not that I recall.
Q And when you met with Alex, he advised you that financing was available through Fairlane Credit?

A That's correct.
Q And did he go over then the terms of the financing with you?
A Yes, he did.
Q And he advised you that Fairlane Credit would need $1500 in a down payment?
A That's correct.
Q And did you agree to a $1500 down payment?
A Hesitantly but I did agree.
Q And Mr. Greiner told you that they weren't going to finance you with less than a $1500 down payment?
A Correct.
Q So if you wanted the car, with your credit history, you had to come up with more down payment?
A That's correct.
Q And you understand that's the reason for that?
A Yes.
Q And you had already agreed to buy the car for $9,995?
A That's correct.
Q And you agreed to $1500 down payment and financing the rest?
A That's correct.

Q Sorry if I'm repeating myself. Was Alex then the only person that you met with that day?
A I believe he was.
( BRIAN LIESKE Deposition Exhibit 4 was marked for identification by the court reporter.)
BY MS. VAN VLIET:
Q Mr. Lieske, take a look at deposition Exhibit No. 4. Is that your signature on the document about the lower right-hand part of the document?
A Yes, it is.
Q And you got a copy of this document?
A Yes, I did.
Q And this is the purchase agreement that you signed?
A That's correct.
Q And it looks like you signed it on the 26th?
A That's correct.
Q Ask that reflects the price of the vehicle at 9,995?
A Yes, it does.
Q And it reflects the total down payment next to one of those big black arrows there $1500?
A That's correct.
Q Now when you signed the purchase agreement, the dealership already had $500 from you that you had

A That's correct.
Q It was your understanding that that's who would be extending you the credit was Fairlane?
A Correct.
Q At the time you met with Mr. Greiner, he went over this contract with you?
A Yes, he did.
Q Take a look sort of in the top half just of the document there's a box there that's entitled "truth in lending disclosures," see that sort of in the middle of the document? This box (indicating). Do you see that?
A Yep.
Q And in that box there's an annual percentage rate?
A That's correct.
Q Mr. Greiner showed you that number?
A Yes, he did.
Q And next to that is the finance charge?
A Yes.
Q Mr. Greiner showed you that number?
A Yes.
Q And next to that is the amount financed?
A That's correct.
Q And Mr. Greiner showed you that number?

A Yes, he did.
Q Next to that is the total amount of payments?
A Yes.
Q Mr. Greiner showed you that number?
A Yes, he did.
Q And to the right of that is the total sales price?
A Yes.
Q And Mr. Greiner showed you that number?
A Yes.
Q And he reviewed those with you prior to you signing the bottom of the document, correct?
A That's correct.
Q And the box in there also has payment schedule?
A Yes.
Q And you reviewed that payment schedule with Mr. Greiner?
A Yes.
Q And you understood that your payments were going to start in October?
A That's correct.
Q And that you were going to make 48 payments?
A Yes.
Q And you reviewed that as well before signing?
A Yes.

Q Now look down to the paragraph in the bottom right-hand corner above your signature. Do you see the paragraph that's titled "notice to buyer"?
A Yes, I do.
Q It says "do not sign this agreement before you read it."
A Yep.
Q And did you in fact read it before you signed it?
A Not thoroughly.
Q Did you read the typed in terms?
A Yes.
Q And Mr. Greiner went over the terms that we talked about?
A That's correct.
Q And there weren't any blanks on the document?
A Nope.
Q Now before you signed the document, did you request a copy of it?
A I did not.
Q Did you have any intention of trying to match or beat this financing on your own with any other lender?
A No, I did not.
Q So you didn't have any intention of going to a

different bank or a credit union or anybody else?
A No, I didn't.
Q And these terms that were being offered were acceptable to you?
A Yes.
Q And you understood those terms at the time that you signed it?
A Yes.
Q And after signing the document you understood that your payments would be going to Fairlane Credit?
A That's correct.
Q Now after you signed the document, did you attempt to switch the financing for the Taurus to a lender other than Fairlane?
A No, I did not.
Q Did you make payments to Fairlane Credit?
A Yes, I did.
Q How many payments did you make?
A I believe it was two or three. I'm not positive.
Q Now you said that you signed the document because the terms were acceptable to you.
A That's correct.
Q And you understood at the time that you were

meeting with Mr. Greiner that if these terms weren't acceptable to you, you could refuse to sign?
A Yes.
Q And you understood that you could look elsewhere for financing if you wanted to?
A Yes.
Q And you also knew that that might be pretty difficult?
A Yes.
Q And wasn't it true that Mr. Perry was the first that told you that he could get you financing on a car?
A Yes.
Q And you didn't ask for a copy of the document because you didn't have intention of looking anywhere else for financing?
A That's correct.
Q And at the time you signed this retail installment contract you didn't know if there was a lender out there that would be able to give you better terms than Fairlane's terms?
A That's correct.
Q In fact you suspected that there probably wasn't?
A Correct.

happened.
Q Because you didn't have a bank account?
A That's correct.
Q And you hadn't tried to get financing from a bank?
A Correct.
Q So No. 18 should be admit?
A Yes.
Q Now you said that you did not ask for a copy of the retail installment contract from Morrie's before you signed it?
A Correct.
Q The reason for that was that you didn't have any intention of looking for financing any place else?
A Correct.
Q And did Morrie's give to you or offer you a copy of the unsigned contract before you signed it?
A During the meeting, yes. The meeting at the signing.
MR. LYONS: A copy of what? A copy of the installment contract?
A On the day that I went in to sign everything, they put it in FRONT of me and went over it with me. That's what I'm referring to.

BY MS. VAN VLIET:

Q Exhibit No. 6?

A Yeah, on the day that I signed that.

Q Did they offer to give you a copy of that before you signed it?

A No, they did not.

Q But they went over everything?

A Yes.

Q And you agreed to all the terms?

A Yes.

Q And you had no intention of looking for financing any place else?

A Right.

Q Have you suffered any damages that you can think of by Morrie's not giving you an unsigned copy of that contract?

MR. LYONS: I'll object. It calls for a legal conclusion. If you know go ahead and answer.

A I don't know.

BY MS. VAN VLIET:

Q Maybe your attorney can help explain these, but you were asked in Request for Admissions No. 23 and 24, "Admit that the truth in lending violation alleged in the complaint." The truth

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO.: 00-2658 JMR/FLN**

---

Brian Lieske,

Plaintiffs,

-vs-

**PLAINTIFF'S ANSWERS TO DEFENDANT'S REQUEST FOR ADMISSIONS AND INTERROGATORY**

Morrie's Brooklyn Park Daewoo d/b/a
Morrie's Brooklyn Park Used Car
& Truck Center, and Todd Perri, individually,

Defendants.

---

TO: **DEFENDANTS ABOVE NAMED AND THEIR ATTORNEY, KAREN MELLING van VLIET, 332 MINNESOTA STREET, FIRST NATIONAL BANK BUILDING, SUITE WEST 975, ST. PAUL, MN 55101:**

**REQUEST FOR ADMISSIONS**

1. Admit that Plaintiff executed the Minnesota Simple Interest Vehicle Retail Installment Contract, which was attached as an Exhibit to the Complaint (hereinafter referred to as the "installment contract").

ANSWER: Admit

2. Admit that Plaintiff requested that Defendant attempt to arrange financing for the purchase of the motor vehicle described in the installment contract.

ANSWER: Deny

3. Admit that Defendant arranged financing for the purchase of the motor vehicle described in the installment contract though Fairlane Credit, LLC.

ANSWER: Admit

4. Admit that Plaintiff executed the installment contract on August 26, 2000.

ANSWER: Admit

EXHIBIT B

5. Admit that the installment contract contained a segregated box entitled "Truth In Lending Disclosures" (hereinafter "segregated TILA disclosure box").

ANSWER: Admit

6. Admit that the segregated TILA disclosure box on the installment contract disclosed an "Annual Percentage Rate" figure of 19.75%.

ANSWER: Admit

7. Admit that the segregated TILA disclosure box on the installment contract disclosed a "Finance Charge" figure of *$4,575.88.*

ANSWER: Admit

8. Admit that the segregated TILA disclosure box on the installment contract disclosed an "Amount Financed" figure of $9,842.36.

ANSWER: Admit

9. Admit that the segregated TILA disclosure box on the installment contract disclosed a "Total of Payments" figure of$14,418.24.

ANSWER: Admit

10. Admit that the segregated TILA disclosure box on the installment contract disclosed a "Total Sale Price" figure of$15,918.24.

ANSWER: Admit

11. Admit that prior to executing the installment contract, Plaintiff reviewed the information contained in the segregated TILA disclosure box.

ANSWER: Admit

12. Admit that the installment contract contained a "Payment Schedule" which disclosed monthly payments of $300.38 over 48 months, with the first monthly payment being due on

October 10, 2000.

ANSWER: Admit

13. Admit that prior to executing the installment contract, Plaintiff reviewed the Payment Schedule information.

ANSWER: Admit

14. Admit that the installment contract contained a "Notice To The Buyer" section which contained the statement: "Do not sign this agreement before you read it or if it contains any blank spaces."

ANSWER: Admit

15. Admit that Plaintiff read the installment contract before he executed it

ANSWER: Admit

16. Admit that prior to executing the installment contract, Plaintiff did not request that the dealership provide them with a copy of the installment contract.

ANSWER: Admit

17. Admit that Plaintiff received a copy of the installment contract he signed.

ANSWER: Admit

18. Admit that prior to executing the installment contract on August 26, 2000, Plaintiff did not attempt to obtain financing for the purchase of the motor vehicle described in the installment contract from his personal bank.

ANSWER: Deny

19. Admit that prior to executing the installment contract on August 26, 2000, Plaintiffs did not attempt to obtain financing for the purchase of the motor vehicle described in the installment contract from their credit union.

ANSWER: Admit

20. Admit that prior to executing the installment contract on August .26, 2000, Plaintiff did not attempt to obtain financing for the purchase of the motor vehicle described in the installment contract from any lending institution.

ANSWER: Admit

21. Admit that Plaintiff has made monthly payments to Fairlane Credit, LLC as required by the installment contract he executed on August 26, 2000.

ANSWER: Admit

22. Admit that since August 26,2000, Plaintiff has not attempted to obtain financing for the motor vehicle described in the installment contract though a different lending institution.

ANSWER: Admit

23. Admit that the truth in lending violation alleged in the Complaint did not proximately cause Plaintiff to suffer any actual damages.

ANSWER: Deny

24. Admit that Plaintiff has no actual damages relating to the truth in lending violation alleged in the complaint.

ANSWER: Deny

**INTERROGATORY**

1. If you have answered any of the foregoing requests for admission with anything other than an unqualified admission, then as to each such response, provide the following:

   a) Identify each and every fact upon which you rely to support your response.

   b) Identify each and every witness upon whom you rely to support your response.

   c) Identify each and every document upon which you rely to support your response and attach copies of such documents to your answers to these interrogatories.

Dated this 2nd day of May, 2001.

**CONSUMER JUSTICE CENTER, P.A.**

By: ______________________
Thomas J. Lyons, Jr.
Attorney I.D. #: 249646
342 East County Road D
Little Canada, Minnesota 55117
Telephone: (651) 770-9707

**THOMAS LYONS & ASSOCIATES, P.A.**
Thomas J. Lyons
Attorney I.D. #: 65699
342 East County Road D
Little Canada, Minnesota 55117
Telephone: (651) 770-9707

Attorneys for Plaintiff