reasonable reliance on misrepresented or inaccurate information provided by a dealer in order to establish that he was defrauded. *Kline v. Nations Bank of Virginia, N.A.*, 886 F.Supp. 1285, 1286 (E.D.Va.1995).

*5 To begin, the odometer reading was properly disclosed on the Re- assignment of Title Form. More importantly however, the Plaintiffs have failed to assert or establish CFAW's specific intent to defraud them as to the mileage on the vehicle. Intent to defraud is necessary for civil liability to flow from violations of the Odometer Act. *Compton,* 121 F.Supp.2d at 941; *Oettinger v. Lakeview Motors,* 675 F.Supp. 1488, 1492-94 (E.D.Va.1988). The intent that is relevant is the intent to deceive the transferee about the accuracy of the mileage of the vehicle.

Acceptance of Plaintiff's allegations that CFAW never transferred title to the Vehicle to them would require the conclusion that ownership was never transferred. The requirement to make Odometer Act disclosures is only triggered by the transfer of ownership. Therefore, if CFAW never transferred title of the vehicle to the Tripps, there was no transfer of ownership and the Odometer Act is not applicable to the transaction. In the alternative, this Court could conclude that ownership in this transaction was passed upon the signing of the Re-assignment of Title form, which is recognized as a legitimate means of transferring title and therefore would effectuate a valid transfer of ownership. In this latter instance CFAW would have transferred ownership of the Taurus to the Tripps in a transaction governed by the strictures of the Odometer Act. However, rather than deciding this issue of state law which has gone heretofore undecided, this Court concludes that in either circumstance CFAW discharged all duties owed the Tripps as to odometer disclosure. The Defendants' motion for summary judgment is GRANTED as to the Odometer Act claims.

*Truth-in-Lending Act Violation*

The TILA is intended to function as a tool "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." *See* 15 U.S.C. § 1601(a). Section 1638(a) of the TILA requires creditors to disclose the amount financed, the total number of payments, the finance charges, the annual percentage rate, the identity of the creditor, and an itemization of the amount financed. *Id.* 12 C.F.R. § 226.17(a)(1)(b) specifies how the credit terms identified in Section 1638(a) should be disclosed to a buyer. It requires a creditor to make these disclosures "clearly and conspicuously in writing, in a form that the consumer may keep...before consummation of the transaction." *See* 12 C.F.R. § 226.17(a)(1)(b) (Regulation Z); *see also* 15 U.S.C. § 1638(a) (requiring disclosures to be made "before the credit is extended."). Consummation occurs when a consumer signs a credit contract thereby binding himself to the credit terms. *See Compton,* 121 F.Supp.2d at 936; 12 C.F.R. § 226.2(a)(13).

The credit terms disclosed to the consumer must "reflect the terms of the legal obligation of the parties." *See* 12 C.F.R. § 226.17(c)(1). In the event the creditor is uncertain of any of the required disclosures, they are to be made based on the "best information reasonably available" and the creditor is required to "state clearly that the disclosure is an estimate." *See* 12 C.F . R. § 22.17(c)(2).

*6 TILA requires the disclosure of all finance charges and disallows their inclusion in the amount financed. *See* 12 C.F.R. § 226.18. Under TILA, a finance charge is "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." *See* 15 U.S.C. § 1605(a). Regulation Z defines a finance charge as a "charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or condition of the extension of credit." *See* 12 C.F.R. § 226.4(a).

Any failure to properly disclose information as required by either the TILA itself or its implementing Regulation Z, results in a technical violation of the Act. *See Walker v. College Toyota, Inc.*, 399 F.Supp. 778 (W.D.Va.1974) (Courts construe the TILA broadly so as to ensure that it will provide protection for consumers). Actual damages are the only remedy available for a dealership's failure to make timely disclosures, which is a violation of 15 U.S.C. § 1638(b). *See* 15 U.S.C. § 1640(a)(4) (indicating statutory damages are only available for violations of 1638(a)(2), (3), (4), (5), (6), and (9)).

The processing fee assessed against the Plaintiffs is charged to both credit and cash customers. *See* Doe Affidavit. Documents released in discovery reveal that CFAW, in its regular course of business, correctly included the processing fee in the amount financed. *See Alston v. Crown Auto, Inc.*, 224 F.3d 332 (4th Cir.2000). ("Because [dealer's] processing

fee is payable in comparable cash transactions...the processing fee was not a 'finance charge ." '); *Polk v. Crown Auto, Inc.*, 228 F.3d 541 (4th Cir.2000) (affirming summary judgment for the Defendant on this point).

The Tripps were provided disclosures on the Credit Contract and had the opportunity to read the contract before signing. This opportunity is sufficient to satisfy the pre-consummation requirement of TILA. *See Nigh* at *9-10,12 (When a consumer is presented with all the written disclosures on the credit contract prior to signing the contract, the consumer's opportunity however brief, to review and reject the terms satisfies TILA); *Polk v. Crown Auto, Inc.*, 221 F.3d 691 (4th Cir.2000)(*Polk I* ).

Future Finance's approval and purchase of the Credit Contract signed by the Tripps was a condition of their financing. If the financing condition had been satisfied, then Plaintiffs and Defendants would have been obligated under the terms of the contract. The fact that the financing condition never came about does not make the credit terms estimates. Additionally, the Tripps' transaction with CFAW was consummated on August 7, 1999, and if the financing condition had been met, the effective date of the transfer of title would have been August 7, 1999.

The statute makes clear that statutory damages are not available for TILA timing violations. Thus, where a dealer has violated the pre-consummation timing requirement only actual damages are available. In this circumstance the only possible actual damage would be that the car dealer's failure to make the disclosures prevented the consumer from getting a better deal. The Tripps acknowledged in depositions that they had no desire or intention to shop around. The Plaintiffs have presented no evidence of any actual damages nor have they presented evidence of detrimental reliance. Thus, they are not entitled to either actual or statutory damages. The Defendant's motion for summary judgment is GRANTED on the TILA claims.

Conclusion

*7 The Release signed by the Tripps is unenforceable thus it does not bar the Plaintiffs' claims. However, the Plaintiffs have failed to establish the intent to defraud necessary to prevail on their Odometer Act Claims and have failed to establish either actual damages or their entitlement to statutory damages. Accordingly, the Defendants' motion for summary judgment is GRANTED and the Plaintiffs' cross-motion for summary judgment is DENIED.

The only counts of the Complaint that remain are those that assert violation of state law. This Court declines to continue its exercise of pendant jurisdiction over them. Accordingly, they are DISMISSED.

ORDER

This matter is before the Court on the Parties' Motions for Summary Judgment. For the reasons stated in the accompanying Memorandum Opinion, the Defendants' Motion is GRANTED and the Plaintiffs' Motion is DENIED.

All other motions in this case previously taken under advisement by this Court are hereby DISMISSED as moot.

Let the Clerk send a copy of this Order to all counsel of record.

It is SO ORDERED.

2001 WL 1105132 (E.D.Va.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court, D. Minnesota.

Fong VANG, Plaintiff,
v.
MORRIE'S MINNETONKA FORD, a Minnesota Corporation, Defendant.

No. 01-82-(DWF/AJB).

Dec. 11, 2001.

Thomas J. Lyons, Esq., Lyons & Associates, Little Canada, appeared on behalf of Plaintiff.

Gregory J. Johnson, Esq., Johnson & van Vliet, St. Paul, appeared on behalf of Defendant.

MEMORANDUM OPINION AND ORDER

FRANK, J.

Introduction

*1 The above-entitled matter came on for hearing on December 7, 2001, pursuant to Defendant's Motion for Summary Judgment. By his Complaint, Plaintiff Fong Vang alleges that Defendant Morrie's Minnetonka Ford ("Minnetonka Ford") violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, specifically 15 U.S.C. § 1638(b)(1) and Revised Regulation Z, 12 C.F.R. § 226.17, by failing to provide him with a separate written disclosure statement, before he reviewed and signed an installment contract, containing those same written disclosures. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment.

Background

The parties have stipulated to the following facts. On November 27, 2000, Fong Vang visited Minnetonka Ford in order to purchase an automobile. To defray the cost of his purchase, Mr. Vang wanted to trade in his 1988 Honda Accord with mileage of 191,854, and Minnetonka Ford agreed to provide a trade-in allowance of $300. Mr. Vang applied the trade-in allowance and a down-payment of $1,000 to the price of a 1995 Mazda Protege LX, leaving the price at $4,995.

To effectuate the purchase, Mr. Vang executed a vehicle purchase contract which set forth the "amount due on delivery" as $5,195.18 and stated in relevant part: "If DEALER is arranging credit for YOU, this CONTRACT is not valid until a credit disclosure is made as described in Regulation Z and you have accepted the credit extended." Subsequent to Mr. Vang's execution of the purchase contract, the dealership's Finance and Insurance representative ("the FI representative") completed a Ford Motor Credit Company ("FMCC") installment sale contract in order to arrange third-party financing and presented the contract to Mr. Vang for his review and signature, if Mr. Vang found the terms to be acceptable. The installment contract contained a segregated box entitled "FEDERAL TRUTH-IN-LENDING DISCLOSURES." Within the box were listed the following disclosures: (1) ANNUAL PERCENTAGE RATE (23.25%); (2) AMOUNT FINANCED ($5,195.18); (3) FINANCE CHARGE ($1,413.70); (4) TOTAL OF PAYMENTS ($6,608.88); and (5) TOTAL SALE PRICE ($7,908.88). After reviewing the installment contract, Mr. Vang signed it, immediately above a provision which stated: "NOTICE TO BUYER: Do not sign this contract before you read it or if it contains any blank spaces. You acknowledge receipt of a true and completely filled in copy of this contract, signed by both you and the seller, at the time of signing." The FI representative removed a carbon copy of the installment contract marked "BUYER'S copy" and gave it to Mr. Vang. Mr. Vang then executed a "Conditional Delivery Agreement" which stated in relevant part: "YOU understand and agree that the vehicle has been delivered to YOU conditionally subject to approval of financing ... If financing is not approved, I will notify YOU and YOU agree to immediately return the vehicle to ME ... If financing is not approved, any installment sales contract executed for purchase of the above-described vehicle shall be null and void."

*2 After executing the documents described above, still on November 27, 2000, Mr. Vang took delivery of the Mazda Protege. On December 1, 2000, FMCC declined to extend financing to Mr. Vang based on his credit history. Minnetonka Ford advised Mr. Vang that it could attempt to arrange alternative third-party financing but that Mr. Vang would have to increase his down-payment to $1,800. Mr. Vang decided not to purchase the vehicle.

Based on the above facts, Mr. Vang brought the current action against Minnetonka Ford, alleging

violation of the Truth in Lending Act. Minnetonka Ford contends, however, that it made the required and accurate disclosures at an appropriate time in compliance with TILA. As such, the parties now bring cross-motions for summary judgment.

Discussion

1. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri,* 92 F.3d 743, 747 (8th Cir.1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action." ' Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir.1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Krenik,* 47 F.3d at 957.

2. Issues

The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.,* was enacted for the purpose of "assur[ing] a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *See* 15 U.S.C. § 1601(a). The specific provision at issue here is 15 U.S.C. § 1638 which requires in part that a creditor disclose: (1) its identity; (2) the amount financed; (3) the finance charge; (4) the annual percentage rate; and (5) the total of payments. 15 U.S.C. § 1638(a). A creditor is further required to make such disclosures "before the credit is extended" and in a manner such that they are "conspicuously segregated from all other terms, data, or information provided in connection with a transaction, including any computations or itemization." 15 U.S.C. § 1638(b)(1). Regulation Z, 12 C.F.R. § 226.1, *et seq.,* the TILA implementing regulation, explicitly provides that:

> ***3** (a) Form of disclosures.
>
> (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep ...
>
> (b) Time of disclosures. The creditor shall make disclosures before consummation of the transaction ...

12 C.F.R. § 226.17(a) & (b). In sum, for purposes of the claim brought here, a creditor must make the required TIL disclosures to the borrower, in writing and in a form that the borrower can take with him, before the transaction is consummated.

The parties stipulate that until a third-party creditor became involved, the dealership qualified as a creditor for purposes of TILA and was thus obligated to make the required TIL disclosures. With respect to the alleged § 1638 violation, the parties do not dispute the form of disclosure, but rather its timing. Plaintiff Vang maintains that the manner in which he received the TIL disclosures on the installment contract was not before, but rather at the same time as the consummation of the transaction and therefore constitutes a violation of TILA, specifically 12 C.F.R. § 226.17(b). To the contrary, Defendant argues that indeed Mr. Vang received the disclosures before the transaction was consummated, in full compliance with TILA. The Court agrees.

Plaintiff urges the Court to follow the reasoning in *Polk v. Crown Auto, Inc.,* 221 F.3d 691 (4th Cir.2000), and several courts that have relied on *Polk,* for its holding that provision of TIL disclosures in a manner akin to the instant case does not meet the TILA timing requirement. *See also, Lozada v. Dale Baker Oldsmobile, Inc.,* 91 F.Supp.2d 1087, 1091-93 (W.D.Mich.2000); *Walters v. First State Bank,* 134 F.Supp.2d 778 (W.D.Va.2001). In *Polk,* the Fourth Circuit held that oral disclosures followed by the execution of a contract and the subsequent delivery of a copy of the signed contract containing the required disclosures did not satisfy the TILA requirement that the written disclosures be provided before consummation. Defendant, however, points to a line of cases that have held to the contrary. *See Nigh v.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*Koons Buick Pontiac GMC Inc.*, 143 F.Supp.2d 535, 548-49 (E.D.Va.2001), *Tripp v. Charlie Falk Auto,* 2001 WL 1105132 (E.D.Va.2001); *Diaz v. Joe Rizza Ford, Inc.*, 2001 WL 1360315 (N.D.Ill.2001).

This Court agrees with the Fourth Circuit in *Polk* when it held that the relevant TILA provisions should be read in conjunction with each other such that the borrower must be presented with the TIL disclosures, in writing, prior to consummation of the transaction, and in a form that can be carried away. However, this Court respectfully disagrees with the Fourth Circuit's interpretation of the requirement to the extent that it would invalidate the procedure followed by the Defendant in the instant case. By its current practice, Defendant presents to the borrower a copy of the contract with the requisite TIL disclosures. The borrower then has the opportunity to review the contract, including the disclosures, and then makes the decision whether or not to execute the contract. There is nothing before the Court that would support the conclusion that the borrower is somehow precluded from reviewing the unsigned contract for five minutes, five hours, or even five weeks. Either way, the borrower is provided with a written copy of the disclosures that he may take with him. In this case, Mr. Vang was given the opportunity to review the contract, and he then made the voluntary decision to execute it immediately before taking his copy with him.

*4 If the Court were to accept Plaintiff's position, then an acceptable practice would be to provide to the borrower a copy of the contract, as the Defendant is accustomed, and to also provide an additional copy of the disclosures. The borrower could still act as Mr. Vang did in this case and execute the contract immediately. However, under those circumstances, the borrower would receive *two* copies, the "borrower copy" and the additional copy, both of which could be taken with him. As the court stated in *Diaz,* this Court fails to see a meaningful distinction between separating the borrower copy before or after the execution when there is no indication that the borrower is precluded from taking the unsigned copy with him instead, if he so chooses. *Diaz,* 2001 WL 1360315, at *2.

To the extent that Plaintiff is actually arguing that the above scenario would also violate TILA because not enough time would pass between disclosure and consummation, the Court does not read TILA to impose a waiting period of any kind, but rather an opportunity for the borrower to evaluate the terms and to shop elsewhere, if he so desires. In effect, TILA leaves the duration of any "waiting period" up to the borrower. To do otherwise would appear to constrict, rather than to expand and protect, the rights of consumers and their ability to purchase. TILA was not intended to thwart impromptu purchasers, but rather to ensure the availability of information for *all* purchasers.

To the extent that consummation arguably did not occur upon Mr. Vang's execution of the installment contract because of the condition included on the purchase contract, *i.e.,* validity of the contract conditioned upon proper disclosure and acceptance of credit, the Court's determination would be no different. If, for example, consummation did not occur until financing was secured and accepted, which did not occur here, then clearly both parties would agree that Mr. Vang received the required disclosures *before* the transaction was consummated. Nonetheless, regardless of whether consummation occurred upon execution or financing and regardless of whether financing is considered a condition precedent or subsequent, the Court finds that Mr. Vang received a written copy of the required disclosures before the transaction was consummated. Accordingly, the Court finds Plaintiff's claim of a TILA timing violation to be without merit and thus does not reach the question of whether statutory damages may be appropriately awarded for a TILA timing violation.

Plaintiff also alleges that Minnetonka Ford violated TILA by failing to label the TIL disclosures as "estimates," given that the transaction was contingent upon financing approval of the disclosed terms by a third-party lender. 12 C.F.R. § 226.17(c)(2). The Court finds Plaintiff's argument on this issue to be without merit. At the time the terms were disclosed, Defendant knew them to be accurate, and Plaintiff agreed to be bound by those terms, if third-party lender approval was obtained. *Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 767 (7th Cir.2000) (finding no TILA "estimates" violation because borrower would have been obligated to purchase pursuant to disclosed terms had financing condition been satisfied). Indeed, as the Court noted above in its discussion of the stipulated facts, both the purchase contract and the conditional delivery agreement contained language indicating that the transaction was conditioned upon third-party lender approval of the agreed upon terms. If those terms could not be met, as was the case here, then the parties could attempt to renegotiate the contract and new disclosures would

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

have to be made. Contrary to Plaintiff's position, the fact that the borrower is not bound to the contract unless the agreed upon terms can be obtained from a third-party lender appears to serve the interests of the consumer. The fact that a borrower may be disappointed that credit terms cannot be obtained is unfortunate but does not constitute evidence of a TILA violation.

***5** For the reasons stated, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Doc. No. 12) is GRANTED;

2. Plaintiff's Cross-Motion for Summary Judgment (Doc. No. 15) is DENIED; and

3. Plaintiff's Amended Complaint (Doc. No. 8) is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

2001 WL 1589614 (D.Minn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court,
D. Nebraska.

Janet **WOJCIK** and Oswald Lorenzo Giron, Plaintiff,
v.
COURTESY AUTO SALES, INC., a Nebraska Corporation, and CMAC, Inc., a Nebraska Corporation, Defendants.

No. 8:01CV506.

Nov. 25, 2002.

MEMORANDUM AND ORDER

JOSEPH F. BATAILLON, District Judge.

*Introduction*

*1 Before me is the plaintiffs' motion for partial summary judgment, Filing No. 36, and the defendants' motion for summary judgment, Filing No. 34. The motions are supported and opposed by briefs and by indexes of evidence, Filing Nos. 37, 35, 38.

The plaintiffs purchased a used vehicle in March 2001 from defendant Courtesy Auto Sales (Courtesy) and financed it through defendant CMAC, Inc. (CMAC). After the plaintiffs allegedly missed payments, the defendants repossessed the vehicle. The plaintiffs filed this complaint, alleging that the defendants violated the federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.;* the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.;* and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* Filing No. 1. The plaintiffs also raise a state law pendent claim for conversion. *Id.* The defendants have counterclaimed for the deficiency that allegedly existed after they sold the repossessed vehicle. Filing No. 4 at 3-4.

*Factual Background*

In March 2001, plaintiff Wojcik purchased a 1992 Explorer from Courtesy. She paid $2300 down and financed the remainder of the $6995 purchase price through CMAC. Courtesy and CMAC are owed by the same individual and are located in the same building. Larry Shellenberger is the general manager of both entities. Filing No. 35, Defendants' Index of Evid., Ex. 3, Shellenberger Aff., ¶¶ 1, 13. CMAC makes direct loans to individuals to finance the purchase of used cars from Courtesy. *Id.,* ¶ 15.

The date on the one-page Nebraska Purchase Contract is March 2, 2001. *Id.,* Ex. 1, Wojcik Dep., Ex.1 (hereafter, Wojcik Dep.). The contract describes the vehicle and notes the cash price, fees, and Wojcik's down payment. A section of the contract labeled "Additional Equipment--Options or Work to Be Done" contains no handwritten or typed notations. Another section of the contract labeled "Buyer's Certification" is pre-printed. In it, the buyer certifies that the contract contains all the terms and conditions of the agreement between the buyer and the dealer and that the buyer has read the contract and received a copy. The certification also contains a "Notice to Buyer," which states, "Do not sign this instrument before you read it, or, if it contains blank spaces. You are entitled to a copy of the instrument you sign. Buyer states that the amounts shown on this instrument were quoted before he/she agreed to the sale." Finally, the certification tells the buyer that the vehicle is being sold "as is" and that the dealer "expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose." A Courtesy employee apparently showed Wojcik the contract on March 2, but she claims that she did not sign it until March 6. Wojcik Dep., 25:13-26:9. Wojcik testified that she "looked at" the contract but "didn't, like, read all the fine detail." Wojcik Dep., 24:15-19.

*2 Wojcik agreed to make thirty payments of $235.50 each. Payments were due on or before the tenth of each month. Plaintiff Giron, who is Wojcik's fiance, co-signed the promissory note but not the Nebraska purchase contract, the buyer's guide, or the limited warranty documentation. *Id.,* Exs.1-4. Wojcik and Giron stated that they signed the paperwork just before closing time on March 6, 2001. According to their deposition testimony, neither read any of the paperwork, but merely signed their names where directed by a Courtesy employee who, according to the plaintiffs, seemed to be in hurry to leave work. *Id.,* 44:5-12; Ex. 2, Giron Dep., 21:10-11, 83:24-84:11 (hereafter, Giron Dep.). Apparently, neither asked for more time to review the paperwork before signing. Woj. Dep., 76:5-23; Giron Dep., 84:12-19.

Neither Wojcik nor Giron had any credit problems before Wojcik purchased the vehicle from the

defendants. *Id.*, 74:21-75:12. Neither checked on his or her own credit report before shopping for a vehicle at Courtesy. *Id.*, 90:19- 92:4. Wojcik testified that a Courtesy employee told her that because she and Giron were "so young, that we didn't have credit, and purchasing the vehicle, that every month that we were on time or whatever, that they would send us to good collection." *Id.*, 92:9-13. Wojcik and Giron did not discuss their past credit rating with any Courtesy employee. *Id.*, 92:24-93:1. No Courtesy or CMAC employee told them that the defendants could "fix" the plaintiffs' prior bad credit, even had it existed. Giron Dep., 60:17-22; 64:7-13.

The promissory note signed by the plaintiffs has a section called "Optional Credit Insurance." Wojcik Dep., Ex. 1. It states that credit insurance is not required to obtain credit and that the lender will not provide any coverage to the buyer unless the buyer wants it. The spaces for credit life and disability insurance coverages are checked, each with two typed X's. The premium quoted for the credit life insurance is $97.14 with a term of thirty months; the premium for the credit disability insurance is $248.21, also with a term of 30 months. Wojcik's signature then appears, just below a line stating, "My signature below means I want only the insurance coverages quoted above. If none are quoted, I have declined all coverages you offered." Despite the language emphasizing the optional nature of the coverage, Wojcik claims that at the time she signed, she did not know what credit life insurance was and was not given time to ask about it. She further claims that she was led to believe that the coverage was required. *Id.*, 41:21-43:19. Wojcik testified that she did not read this section of the promissory note before signing it because the defendants were rushing her out the door at closing time. *Id.*, 34:1-19; 43:20-44:12.

Just below Wojcik's first signature on the promissory note is another section stating, in boldface, the following:

*3 Notice to Consumer:

1. Do not sign this agreement before you read it.
2. You are entitled to a copy of this agreement.
3. You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with the law.

SIGNATURES: I AGREE TO THE TERMS SET OUT ON THE FRONT AND BACK OF THIS AGREEMENT. I HAVE RECEIVED A COPY OF THIS DOCUMENT ON TODAY'S DATE.

*Id.*, Ex. 1 at 1. A term on the back of the note labeled "PREPAYMENT" provides that a "partial prepayment will not excuse any later scheduled payments until this note is paid in full." *Id.*, at 2. Another term on the back labeled "DEFAULT" provides that a buyer defaults by failing "to make one or more payments on time or in the amount due." *Id.* Wojcik and Giron's signatures both appear on the front page of the note, along with that of Linjo Leeds, the finance manager. Wojcik testified that she did not read the promissory note before signing it, but that she did receive copies of all the paperwork she signed.

Likewise, neither Wojcik nor Giron read the Buyer's Guide before Wojcik signed it. The guide described a limited warranty in which the dealer agreed to pay 50% of the labor and 50% of the parts for covered systems that failed during the duration of the warranty. *Id.*, Ex. 2 at 1. The systems covered included the engine, the transmission/transfer case, and the drive axle. The warranty was for 360 days or 12,000 miles, whichever occurred first. The guide stated, in capital letters just above Wojcik's signature, "PRE-PURCHASE INSPECTION: ASK THE DEALER IF YOU MAY HAVE THIS VEHICLE INSPECTED BY YOUR MECHANIC EITHER ON OR OFF THE LOT." *Id.* Before the plaintiffs took possession of the vehicle, however, they neither test drove it nor had a mechanic inspect it. Nor did Giron, who has training and has been employed as a mechanic, inspect the vehicle before taking possession of it. Giron Dep., 22:10-24:21. Wojcik claims that one of Courtesy's employees orally told the plaintiffs that if any warranted repairs needed to be done and the plaintiffs could not pay for them, the cost of the repairs would be added to the end of the payments without interest. Wojcik Dep., 29:19-30:14.

Neither Wojcik nor Giron read the limited warranty. *See id.*, Ex. 3. Wojcik's signature appears twice on the document, the first time beneath a paragraph written in capital letters stating the buyer has read the limited warranty and understands it. Wojcik testified that the Courtesy employee went over what the warranty covered, but that she herself did not read or examine the warranty's provisions.

The plaintiffs allege that they had numerous problems with the vehicle after they took possession, including difficulties with the transmission, alignment, tie rods, and wheel bearings. The plaintiffs claim that the defendants breached their oral promise

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

to repair the vehicle if the plaintiffs brought it back. Giron Dep., 26:12-27:11; Wojcik Dep., 57:3-23. The plaintiffs also allege that the defendants breached the limited warranty by failing to properly repair the transmission, requiring the plaintiffs to take the vehicle to several repair shops. Wojcik Dep., 53:8-64:15. The plaintiffs say that they finally took the vehicle to the defendants and announced they would make no more payments until the defendants repaired the transmission, but that the defendants claimed they could find nothing wrong with it. *Id.*, 59:17-62:24.

*4 Wojcik claims that the plaintiffs were current on payments when the defendants repossessed the vehicle, *id.*, 64:16-19, but CMAC served the plaintiffs with a Notice to Cure Default on April 11, 2001, *id.*, Ex. 5. Wojcik testified that the plaintiffs made two payments in April 2001, the first of which was late, and then regular, on-time payments in May, June, and July. *Id.*, 45:12-46:12. Wojcik also testified, however, that she made no payment in August 2001 because she believed the two April payments put her one payment ahead, despite the "prepayment" provision quoted above. *Id.*, 128:3-25. The defendants repossessed the vehicle on September 5, 2001. The plaintiffs had driven the vehicle 8,000 miles. *Id.*, 112:5-7. After repossession, the defendants allowed Giron to take the license plates and other personal belongings from the vehicle. Wojcik testified that two children's toys, several cassette tapes, light bulbs, receipts, and insurance papers--worth approximately $50 total--were not returned to the plaintiffs after it was repossessed. *Id.*, 122:16-125:1.

*Legal Standard*

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(C); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995). Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Id.*

The burden of establishing the non-existence of any genuine issue of material fact is on the moving party. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Therefore, if defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence. *Adickes*, 398 U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational Inc.*, 825 F.2d 167, 173 (8th Cir.1987).

Once the defendant meets its initial burden of showing there is no genuine issue of material fact, the plaintiff may not rest upon the allegations of his or her pleadings but rather must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *See* Fed.R.Civ.P. 56(e); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir.1998). The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts; he or she must show "there is sufficient evidence to support a jury verdict" in his or her favor. *Id.* Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Discussion*
*Count I: Truth in Lending Act*

***5** *Plaintiffs' Motion.* The plaintiffs seek partial summary judgment on their first cause of action for violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* (TILA). The plaintiffs maintain that because the defendants allegedly did not provide them in a timely manner with the disclosures which the TILA requires, the defendants are strictly liable for statutory damages.

The plaintiffs say that they took the vehicle under a closed end credit plan, which requires the creditor to make the required disclosures to the debtor before extending credit. *See* 15 U.S.C. § 1638(a) (listing the required disclosures); 15 U.S.C. § 1638(b) (stating that disclosures required in subsection (a) must be made "before the credit is extended" and in a "conspicuous[ ]" manner, "separated from all other terms, data or information"). Regulation Z, promulgated by the Federal Reserve Board to carry out the TILA, requires a creditor in a closed end credit plan to make the disclosures "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a). The creditor must

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

make the disclosures "before the consummation of the transaction," 12 C.F.R. § 226.17(b), *i.e.,* before "the time that a consumer becomes contractually obligated on a credit transaction," 12 C.F.R. § 226.2(a)(13). The plaintiffs contend that because they did not receive the required disclosures from the defendants before the agreement was consummated" but only when they signed the paperwork, the defendants technically violated the TILA and hence are liable for statutory damages.

Successful plaintiffs in an individual action may recover statutory damages for "twice the amount of any finance charge in connection with the transaction." 15 U.S.C. § 1640(a)(2)(A)(i). With this timing argument, the plaintiffs are claiming they are entitled to statutory damages only for the alleged violation of section 1638(b). "The plaintiffs in this instance are making claims for statutory damages for non-disclosure pursuant to *15 U.S . C. § 1638(b)(1).*" Plaintiffs' Brief for Partial Summary Judgment at 12 (italics in original); *see also* Plaintiffs' Brief Opposing Defendants' Motion for Summary Judgment at 7-8.

Subsection 1638(b)(1), however, deals only with the timing and form of the disclosures required by section 1638(a). A violation of subsection 1638(b)(1) does not trigger a grant of statutory damages. The statute authorizing statutory damages, section 1640(a), states, "In connection with the disclosures referred to in section 1638 of this title, a creditor shall have liability determined under paragraph (2) [of section 1640(a) ] *only* for failing to comply with the requirements of ... (3), (4), (5), (6), or (9) of *section 1638(a).* ..." 15 U.S.C. § 1640(a)(2)(B) (emphasis added). Since subsection 1638(b)(1) is not included in this list of sections triggering an award of statutory damages, the plaintiffs here are without a remedy for the violation they allege. "Had Congress intended to allow the recovery of statutory damages for violations of the timing requirements of subsection 1638(b)(1), it would have included that subsection in the sentence enumerating the provisions for which statutory damages are available." *Malchow v. GMI Acquisition, Inc.,* 2002 WL 31185865, *4 (D.Minn. Oct.1, 2002). Thus, even assuming that the TILA was technically violated by providing the plaintiffs with the required disclosures contemporaneously with their signatures on the promissory note, the violation is not one entitling the plaintiffs to statutory damages. [FN1] The plaintiffs' motion for partial summary judgment is therefore denied insofar as it is based on an alleged violation of the timing requirements of 15 U.S.C. § 1638(b)(1).

FN1. I specifically do not address as part of the plaintiffs' motion for partial summary judgment the issue of whether the timing of the disclosures here violated the TILA, since the unavailability of the relief the plaintiffs seek renders the issue moot. Although the Eighth Circuit has not directly addressed the issue, other courts presented with nearly identical facts are divided. *Cf., e.g., Vang v. Morrie's Minnetonka Ford,* 2001 WL 1589614, at *3-4 (D.Minn.) (TILA only requires that borrower have an opportunity to review disclosures before deciding to execute the agreement; TILA imposes no "waiting period"), *with Polk v. Crown Auto, Inc.,* 221 F.3d 691 (4th Cir.2000) (TILA's "before consummation" requirement not satisfied by oral disclosures followed by execution of a contract and the subsequent delivery of a copy of the signed contract containing the required disclosures). I conclude that the cases finding that an opportunity to review disclosures before consummation satisfies the TILA are the better reasoned and likely would apply here. The defendants did not require the plaintiffs to sign the promissory note before the time CMAC made the required disclosures. If the plaintiffs felt rushed about signing, as they claim, nothing precluded them from taking a copy of the promissory note with them for further pre-signature review.

*6 The plaintiffs also claim that they are entitled to summary judgment because the defendants' disclosure forms violated the mandatory disclosure requirements of 15 U.S.C. § 1638(a) "by failing to state the total amount due over the term of the loan, and for listing two interest rates on the fact [sic] of the disclosure documents." Plaintiffs' Brief for Partial Summary Judgment at 13. Additionally, the plaintiffs claim that the defendants " 'packed' or added in" and then failed to disclose a prepaid finance charge and charges for credit life and disability insurance. *Id.* at 14. Section 1638(a) requires the creditor in a closed ended credit plan to express the finance charge as an "annual percentage rate" and to state the sum of the amount financed and the finance charges as the "total of payments." 15 U.S.C. § 1638(a)(2)(B)(4)-(5). The plaintiffs contend that the two interest rates given in the promissory note confused them, that they would not have agreed to the credit insurance had they been told it was optional, and that they were never told the total amount of the payments.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

The defendants respond that the promissory note which the plaintiffs signed complies with all the TILA disclosure and computation requirements. CMAC holds a small loan license from the State of Nebraska and must, as a condition of its license, comply with the TILA regulations as enforced by the Nebraska Department of Banking. CMAC apparently submitted this loan to the department for review after the plaintiffs filed suit and received a letter from the district examiner stating that all amounts for the APR, agreed rate, origination fees, and insurance premiums "were in compliance with the applicable statutes and regulations." Filing No. 35, Ex. 4 at 1. CMAC argues that since the department found that the disclosures in the promissory note met the requirements imposed by the TILA, the plaintiffs can have no claim under TILA. Further, CMAC argues that the plaintiffs are asking the court for relief even though both admit that they read none of the documentation connected to the transaction before they signed the promissory note, despite conspicuous warnings on the face of the documents to do so. "Surely, *some* responsibility lies on the Plaintiffs to at least read the warnings that TILA and other consumer protection statutes require." Defendants' Brief Opposing Plaintiffs' Motion for Partial Summary Judgment at 3 (emphasis in original).

I generally agree. In a box starting approximately a third of the way down the first page, the promissory note clearly states the annual percentage rate as 25.81%, the finance charge as $1916.65, the amount financed as $5148.35, and the total payments as $7065.00. This information plainly, conspicuously, and unambiguously fits the disclosure requirements of subsections 1638(a)(2)(B)(4)- (5) and subsection 1638(b)(1). The TILA does not make a lender responsible for a borrower's failure either to read, understand, or question such basic information as this or to heed warnings phrased in plain English that a document should not be signed until read. The plaintiffs' youth and inexperience may have accounted for their unfamiliarity with how credit transactions work, but--hard lesson that it is--youth and inexperience cannot excuse the plaintiffs' failure to read the loan documents before signing them. The plaintiffs were shown the required TILA disclosures before the transaction was consummated and had the opportunity to review them.

*7 Accordingly, the plaintiffs' motion for partial summary judgment for the defendants' alleged violation of the disclosure, form, and timing requirements of 15 U.S.C. §§ 1638(a) and (b) is denied.

*Defendants' Motion*. The defendants also move for summary judgment on the plaintiffs' TILA claim.

Courtesy argues that as a car dealership licensed by the Nebraska Motor Vehicle Dealers Licensing Board, it is not a "creditor" under the TILA. A TILA creditor is one who both 1) regularly extends consumer credit payable in more than four installments and 2) is the person to whom the debt arising from the transaction is initially payable. 15 U.S.C. § 1602(f). The plaintiffs contend, without offering any supporting authority, that because Courtesy and CMAC share facilities, management, and ownership, Courtesy must be found a creditor along with CMAC. I find, however, that Courtesy and CMAC are separate corporate entities. Because Courtesy does not itself loan money, finance purchases, charge interest, or repossess collateral upon default, it cannot be a "creditor" for purposes of the TILA or Regulation Z. I therefore grant as a matter of law Courtesy's motion for summary judgment on the plaintiffs' TILA claim.

CMAC contends that it is also entitled to summary judgment on the TILA claim. I agree.

First, because I have already found that statutory damages are not available to the plaintiffs for the alleged violation of subsection 1638(b)(1), CMAC is entitled to summary judgment on that claim.

Second, because I have already found that CMAC did not violate subsections 1638(a)(2)(B)(4)-(5), the plaintiffs cannot recover the statutory damages they request. CMAC is thus entitled to summary judgment on that claim.

Third, even if CMAC were found to have technically violated section 1638(a), the plaintiffs could not establish that they sustained any actual damage as a result of the violation. *See* 15 U.S.C. § 1640(a)(1) (consumer may recover actual damages proximately related to the creditor's violation). To recover actual damages, plaintiffs must show that they relied to their detriment on an inaccurate disclosure. *Peters v. Jim Lupient Oldsmobile*, 220 F.3d 915, 917 (8th Cir.2000). Since none of the defendants' TILA disclosures were inaccurate--and since the plaintiffs admit that they never read the disclosures, that they did not shop anywhere else for other vehicles or credit, and that they were given a copy of the disclosures contemporaneously with signing the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

note--the plaintiffs cannot establish detrimental reliance. The court would be required to find, as a matter of law, that the plaintiffs could not require actual damages under the TILA.

Accordingly, CMAC's motion for summary judgment on the plaintiffs' TILA cause of action is granted.

*Count II: Credit Repair Organizations Act*

The plaintiffs allege in their second cause of action that the defendants routinely advertise that the purchase of a car from the defendants will help consumers improve their credit record and history. The plaintiffs further allege that Courtesy made untrue and misleading representations about services it would provide to the plaintiffs in connection with credit repair services in violation of the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.* (CROA). Filing No. 1, Complaint, ¶¶ 18, 20. The defendants contend, however, that the CROA does not apply to them and that they are entitled to summary judgment as a matter of law. I agree.

***8** The purpose of the CROA is to provide prospective buyers of the services of a credit repair organization, who are often consumers "of limited economic means and who are inexperienced in credit matters," 15 U.S.C. § 1679(a)(2), with "the information necessary to make an informed decision" about such a purchase, as well as to "protect the public from unfair or deceptive advertising and business practices" by credit repair organizations. 15 U.S.C. § 1679(b). Under the CROA, a "credit repair organization" sells, provides, or performs services either to improve a consumer's credit record, history, or rating or to assist or advise a consumer with respect to the consumer's credit record, history, or rating.15 U.S.C. § 1679a(3). The CROA prohibits any person from making or using untrue or misleading representations to a consumer about the services of the credit repair organization or from defrauding or deceiving a consumer about the offer or sale of the services of the credit repair organization. 15 U.S.C. § 1679b(a)(3)-(4).

A car dealership could obviously fit into the credit repair organization category. But while I agree with the assertions in the plaintiffs' responsive brief that the plaintiffs' deposition testimony shows them to be naively inexperienced in credit matters, and that in general consumer protection statutes are to be construed liberally in favor of consumers, Plaintiff's Brief Opposing Defendants' Motion for Summary Judgment at 11-12, common sense alone dictates that a plaintiffs' status as an inexperienced consumer cannot convert a used car dealership into a credit repair organization. [FN2]

FN2. In fact, at least one court has said that Congress did not intend to include auto dealerships "who arrange for purchase financing ancillary to their primary business of selling and leasing motor vehicles," in the definition of a credit repair organization. *See Sannes v. Jeff Wyler Chevrolet, Inc.*, 1999 WL 33313134, * 4 (S.D.Ohio).

First, despite the allegation in the plaintiffs' complaint that Courtesy advertised its services as a credit repair organization, the plaintiffs testified that when they first started looking for a used car, they had never seen or heard any public representations by Courtesy that it offered credit repair services. The plaintiffs were therefore not lured to Courtesy by any credit repair advertising or promotion; rather, they were essentially walk-in trade. Nor have the plaintiffs offered any documentary or physical evidence that the defendants engaged in any advertising, solicitation, or promotion about credit repair services. Courtesy and CMAC were in no way similar to a company found to be a credit repair organization based upon its representations in advertising that it could obtain or provide car financing for anyone, no matter how bad his or her credit and that it could restore good credit. *Parker v. 1-800 Bar None, a Financial Corp., Inc.*, 2002 WL 215530, *3 (N.D.Ill.)
.

Second, Giron testified that he saw something on a wall at Courtesy's office about helping first time buyers build credit, but that the defendants said nothing to him about fixing his bad past credit. Giron Dep., 18:5-21, 63:18- 64:9. Wojcik also testified neither Courtesy nor CMAC said anything about her poor credit rating; rather, an employee told them that since they were young people without credit, they could build a good credit record for themselves by making their car payments on time. Wojcik Dep., 91:20-97:1. The fact of the matter is that neither Giron nor Wojcik had any credit problems to repair when they purchased the vehicle from Courtesy. Even if the advice which the employee offered the plaintiffs about building a good credit record somehow converted Courtesy and CMAC into credit repair organizations, the defendants could not be liable under the CROA because the advice was not false, misleading, fraudulent or deceptive. Making payments on time does improve a consumer's credit

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

rating.

***9** Third, even assuming the defendants were credit repair organizations and that the defendants' advice about building good credit was a prohibited practice, the defendants could not be liable under the CROA. By definition, a credit repair organization offers its services "in return for the payment of money or other valuable consideration." 15 U.S.C. § 1679a(3)(A). The documentary evidence clearly shows that the defendants did not charge the plaintiffs any additional fee for any alleged credit repair service. *See Sannes v. Jeff Wyler Chevrolet, Inc.*, 1999 WL 33313134, * 3 (S.D.Ohio).

Accordingly, the defendants' motion for summary judgment on the plaintiffs' CROA cause of action is granted as a matter of law.

*Count III: Magnuson-Moss Warranty Act*

The plaintiffs' complaint alleges that the defendants failed to honor the plaintiffs' warranty and an "implied warranty of merchantability for the vehicle's fitness for a particular use" in violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (MMWA). Filing No. 1, Complaint, ¶ 23. The defendants contend they are entitled to summary judgment because the MMWA does not apply to the type of agreement between plaintiffs and the defendants.

Despite the parties' assumption that the MMWA applies to this situation, neither has addressed the jurisdictional limitations created by section 2310(d) of the MMWA. That section provides in part that a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with an obligation under a warranty or a service contract may bring a suit for damages and other legal and equitable relief in a federal district court, 15 U.S.C. § 2310(d)(1)(B), but only if each individual claim is at least $25 and the entire amount in controversy is at least $50,000 (exclusive of interests and costs), 15 U.S.C. § 2310(d)(3)(A)-(B). This minimum $50,000 amount in controversy "limits the availability of a federal forum for individual consumer actions." *Barnette v. General Motors Corp.*, 434 F.Supp. 1167, 1168 (D.Neb.1977) (plaintiff claiming damages of $7,000 for defective automobile barred from bringing suit in federal district court under the MMWA). The burden of establishing this jurisdictional amount in controversy rests on the plaintiffs. *Rose v. A & L Motor Sales*, 669 F.Supp. 75 (W.D.Pa.1988).

While the complaint does not state the exact amount of the plaintiffs' alleged damages, the documentary evidence and deposition testimony submitted in connection with the motions for summary judgment establish that the plaintiffs' alleged actual damages fall far short of $50,000 jurisdictional minimum. Further, I have already held that the plaintiffs cannot recover damages for either their TILA or CROA claims; the plaintiffs' claim for statutory and actual damages therefore cannot be considered in determining whether the plaintiffs have met the $50,000 jurisdictional requirement. Finally, the plaintiffs' attorney's fees cannot be used to meet the $50,000 amount in controversy. *See Sanford v. Ektelon/Prince Sports Group, Inc.*, 1999 WL 33537914, *7 (D.Neb.1999).

***10** Because the plaintiffs' MMWA claim thus does not meet the $50,000 amount in controversy requirement, it cannot be heard by this court. Without passing on the merits of the plaintiffs' warranty claim, I note that an individual consumer action such as this would have been better brought before a state court. Accordingly, I will grant summary judgment on the defendants' motion for summary judgment, but dismiss the plaintiffs' MMWA warranty claims without prejudice to their being brought in state court. *See Huson v. General Motors Acceptance Corp.*, 108 F.3d 172, 174 (8th Cir.1997).

Count IV: State Law Conversion

The sole remaining claim is the plaintiffs' state law conversion claim. The plaintiffs allege that when the defendants wrongfully repossessed the vehicle, they also took possession of certain items of the plaintiffs' personal property, which, apparently, the defendants have not returned. Filing No. 1, Complaint, ¶¶ 26-30.

In a situation such as this, where a federal court has dismissed all claims that fell within its original jurisdiction, the court may decline to exercise supplemental jurisdiction [FN3] over pendent state law claims. 28 U.S.C. § 1367(c). Federal courts are encouraged to "exercise judicial restraint and avoid state law issues wherever possible." *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir.1990). Given the simplicity of the conversion claim and its low dollar value, it would be inappropriate for this court to decide what is essentially a matter for the county court. Accordingly, I will grant the defendants' motion for summary judgment, but I dismiss the plaintiffs' conversion claim without prejudice subject

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

to it being brought in state court.

FN3. A federal district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

IT IS THEREFORE ORDERED:

1. The plaintiffs' motion for partial summary judgment, Filing No. 36, is denied;

2. The defendants' motion for summary judgment, Filing No. 34, is granted;

3. Counts I and II of the plaintiffs' complaint, Filing No. 1, are dismissed with prejudice, but Counts III and IV are dismissed without prejudice; and

4. Judgment for the defendants shall be entered by separate order.

2002 WL 31663298 (D.Neb.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works